OA 91 Criminal Complaint

# United States District Court

FILED
JUL 20 2007
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA
V.
JULIO LOPEZ-MORALES

CRIMINAL COMPLAINT

SEALED BY COURT ORDER

Case Number: 4-07-70433

WDB NJV

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state that the following is true and correct to the best of my knowledge and belief. On or about February 2, 2007 (Date) in Alameda County, in the Northern District of California defendant(s) did,

(Track Statutory Language of Offense)

knowingly and in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transport, and move such alien within the United States by means of transportation and otherwise

in violation of Title 8 United States Code, Section(s) 1324(a)(1)(A)(ii)

I further state that I am a(n) Special Agent of ICE (Official Title) and that this complaint is based on the following facts:

See Attached Affidavit

Continued on the attached sheet and made a part hereof: ☒ Yes ☐ No

Approved As To Form: H. H. (Shashi) Kewalramani
AUSA

ICE SA Brian Ginn
Name/Signature of Complainant

Sworn to before me and subscribed in my presence,

July 20, 2007
Date

at San Francisco, California
City and State

U.S. Magistrate Judge Nandor Vadas
Name & Title of Judicial Officer

Signature of Judicial Officer

Document No.
District Court
Criminal Case Processing

## AFFIDAVIT IN SUPPORT OF COMPLAINT AND ARREST WARRANT

I, Brian L. Ginn, declare the following:

### I. INTRODUCTION AND BACKGROUND

1. I am a Special Agent with the United States Immigration and Customs Enforcement (ICE) within the United States Department of Homeland Security, formerly known as the Immigration and Naturalization Service. I have been employed in that capacity since August 2004. I am currently assigned to the ICE Human Smuggling/Benefit Fraud Group, San Francisco Office. Before joining ICE, I was employed as a United States Border Patrol Agent within the United States Department of Homeland Security. I was employed in that capacity from June 2001 to July 2004.

2. I make this affidavit in support of a complaint against and arrest warrant for Julio LOPEZ-MORALES, charging him with violating 8 U.S.C. §1324(a)(1)(A)(ii) – Bringing in and harboring certain aliens by transporting at least one person who LOPEZ-MORALES knew was an alien, or in reckless disregard of same fact, from the Phoenix, Arizona area to Oakland, California on or about February 2, 2007.

3. Title 8, United States Code, Section 1324(a)(1)(A)(ii) provides as follows:

> Any person who – knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law, shall be punished as provided in subparagraph (B).

Section 1324(a)(1)(B)(i), in turn, provides that an individual who violates 1324(a)(1)(A)(ii) for the purpose of commercial advantage or private financial gain shall be fined under Title 18, United States Code, and imprisoned not more than 10 years, or both.

4. As an ICE Special Agent, I regularly investigate smuggling cases involving undocumented aliens smuggled into the United States across the U.S./Mexico border. In conducting these investigations, I have: (1) written hundreds of reports of investigation; (2) participated in surveillance operations; (3) interviewed witnesses and informants; (4) served and participated in the execution of search and arrest warrants; (5) monitored electronically intercepted telephone calls; and (6) obtained and analyzed telephone and financial records. As a United States Border Patrol Agent, I conducted investigations into the smuggling of undocumented aliens across the U.S./Mexico border. In conducting those investigations, I: (1) performed traffic stops; (2) conducted checkpoint inspections; (3) wrote reports of investigation; and (4) interviewed undocumented aliens smuggled into the United States across the U.S./Mexico border.

5. The information contained in this affidavit is known to me through personal knowledge and information received from other law enforcement personnel. This affidavit is based upon

1

my training and experience as an ICE agent and that of other ICE agents and law enforcement personnel with whom I have discussed this matter.

6. As this affidavit is being submitted for the limited purpose of supporting a criminal complaint and obtaining an arrest warrant, I have not included each and every fact known to me concerning this investigation. I have instead set forth facts that I believe are sufficient to establish probable cause for the Court to authorize a complaint and arrest warrant against LOPEZ-MORALES.

## II. SUMMARY OF PROBABLE CAUSE

7. On or about February 2, 2007, LOPEZ-MORALES transported at least three (3) aliens that were Guatemalan nationals, CS-2, her infant son, and CS-3, from the Phoenix, Arizona area to Oakland, California knowing, or in reckless disregard of the fact, that CS-2, her infant son, and CS-3 were aliens that entered the country illegally. Once in Oakland, California, LOPEZ-MORALES, in conjunction with CS-2's smuggler in Mexico, sought to obtain additional smuggling money from CS-2's boyfriend and the father of her infant son, CS-1. Once CS-1 refused to pay LOPEZ-MORALES the additional money, LOPEZ-MORALES drove away from the location with CS-2 and CS-3, separating CS-2 from her infant son whom family members of CS-2 had managed to extricate from the vehicle. CS-2[1] was found and rescued in Fairfield, California that same day after her location was determined through tracking a Sprint cellular telephone number that CS-1 provided as belonging to the driver of the smuggling vehicle. The driver of the smuggling vehicle was later identified as LOPEZ-MORALES when latent fingerprints recovered from the vehicle used to drive the smuggled individuals from Arizona to California were run through databases and positively identified as belonging to LOPEZ-MORALES. Subsequent photo identifications of LOPEZ-MORALES were then made by CS-1, CS-2, and CS-3 from photographic line-up displays.

## III. FACTS ESTABLISHING PROBABLE CAUSE

A. **Receiving Information Regarding Alien Smuggling/Kidnapping From The Oakland Police Department (OPD) And Rescuing Alien Victim In Fairfield, California**

8. On February 2, 2007, I was contacted by Oakland Police Department Special Victims Unit (OPD SVU) Officer Mark Battle. Officer Battle advised me that OPD had received a report from a man, CS-1, who had hired a "coyote"[2] to smuggle his seventeen (17) year old girlfriend, CS-2,[3] and their one (1) year old son into the United States from Guatemala. Officer Battle

---

[1] CS-3 was found with CS-2 at the time of CS-2's rescue.

[2] "Coyote" is a term commonly used to refer to human smugglers.

[3] It was initially believed that CS-1 and CS-2 were married, but it was later determined that they were in fact boyfriend and girlfriend. CS-1, CS-2, their infant son, and CS-3 (described in additional detail later in the affidavit) are Guatemalen nationals and were here illegally. CS-1, CS-2, their infant son, and CS-3 have been provided Significant Public Benefit Paroles (SPBP) into the United States by the Department of Homeland Security for the purpose of being able to remain as witnesses in this investigation. CS-1, CS-2, and CS-3 have also received Employment Authorization Cards as a part of their SPBP.

2

advised me that CS-1 had met with the smugglers that transported his wife and one year old son from Mesa, Arizona at a Walgreen's parking lot in the Fruitvale District of Oakland, CA earlier in the afternoon at which time CS-1's friend was able to rescue CS-1's son from the smugglers. Officer Battle advised me that CS-1 told him that the smugglers had demanded more money for the release of CS-2. Officer Battle advised that following a struggle, the smugglers had driven away with CS-2 and several other individuals that were also in the car.

9. Following the call from Officer Battle, I and other ICE agents responded to the Fruitvale District of Oakland, CA where OPD officers were meeting with and interviewing CS-1 and other witnesses to the altercation with the smugglers in the Walgreen's parking lot. One of the interviewing officers advised me that CS-1 had paid $4000.00 to have his wife smuggled into the United States and that CS-1 had wired the money to an account in Mexico. The interviewing OPD Officer advised that CS-1 had received a call from his wife and son's smugglers earlier in the afternoon of February 2, 2007, directing him to go to a Walgreen's parking lot located at 3232 Foothill Blvd, Oakland, CA. The interviewing officer related that CS-1 had traveled to the Walgreen's parking lot where the smugglers, driving a white four (4) door car, had given him back his son but had demanded $2500.00 more be wired to Mexico for the release of CS-2. The interviewing officer related that a friend of CS-1 had broken out two passenger windows of the smugglers' vehicle in an attempt to extricate CS-2 from the car. The interviewing officer advised that CS-1 had also tried to stop the smugglers' vehicle from driving away and had almost been hit by the car as it fled.

10. The interviewing officer of CS-1 provided me with a telephone number, 480-323-9470, which CS-1 had advised was the telephone number of the driver of the smuggling vehicle. The number was determined to belong to Sprint and I contacted the Sprint Law Enforcement Assistance Line and declared an exigent circumstance in relation to the kidnapping of CS-1's wife. GPS tracking of 480-323-9470 was requested as part of the exigent circumstance.

11. GPS coordinates for 480-323-9470 provided by Sprint indicated that the phone was located in Fairfield, CA. OPD subsequently advised the Fairfield Police Department (FPD) of the approximate location of the GPS coordinates and a description of the smuggling vehicle. FPD officers subsequently located a vehicle matching the description of the smuggling vehicle[4] in the parking lot of the E-Z 8 Motel, 3331 N. Texas Street, Fairfield, CA, 94533. The FPD officers contacted the EZ-8 Motel manager who provided them with the room number associated with the vehicle. I responded to the EZ-8 Motel along with other ICE agents and OPD officers.

12. At approximately 6:30 p.m. on February 2, 2007, FPD made entry into Room #115 of the EZ-8 Motel, the room associated with the smuggling vehicle. Discovered inside were CS-2 and another smuggled Guatemalan female, CS-3. Both CS-2 and CS-3 indicated that their smugglers had left them in the room prior to the arrival of law enforcement.

---

[4] The smuggling vehicle was determined to be a 1995 White Infiniti with Arizona License Plate 506WAE. Upon examination after being found in the EZ-8 Motel parking lot, the rear passenger door window of the vehicle was found to be broken out. The registered owner of the vehicle is listed with the Arizona Motor Vehicle Department as Elisandro Calderon-Viatoro, 524 W. 9th Street #113, Mesa, AZ, 85201. The address listed on the Sprint account for the subscriber to the smuggling vehicle driver's cell-phone, Favio Morales, is also 523 W. 9th Street #113, Mesa, AZ, 85201.

3

### B. Identification of LOPEZ-MORALES's Fingerprints On The Smuggling Vehicle And Relationship To Registered Owner Of Smuggling Vehicle.

13. An OPD Crime Scene Technician processed the smuggling vehicle, Arizona License Plate number 506WAE, for fingerprints. According to Arizona records, the smuggling vehicle was registered to Elisandro CALDERON-VIATORO in Mesa, Arizona. Multiple latent fingerprints were lifted from the vehicle, including latent fingerprints lifted from the front left corner of the hood of the vehicle. Electronic scans of the latent fingerprint lifts were subsequently sent to the Department of Homeland Security (DHS) Biometric Support Center West located in San Diego, CA, with a request for the prints to be run through databases to include the AFIS and IDENT systems.[5]

14. The DHS Biometric Support Center West identified that the fingerprints lifted from the left corner of the hood of the smuggling vehicle belonged to Julio LOPEZ-MORALES, an undocumented alien who had been apprehended by the United States Border Patrol in Arizona in April 2006 as he was crossing the U.S./Mexican border into the United States. A search of the IDENT database indicated that LOPEZ-MORALES had been apprehended in April 2006 along with a Cesar CALDERON a/k/a Gerardo CALDERON-CASTILLO. Record checks results provided to me by the Mesa Police Department indicated that the name of the registered owner of the smuggling vehicle, Elisandro CALDERON-VIATORO, was an alias for Gerardo CALDERON-CASTILLO. Based on my review of a photograph of Gerardo CALDERON-CASTILLO a/k/a Elisandro CALDERON-VIATORO provided by the Mesa Police Department, I believe it appears to be same Cesar CALDERON a/k/a Gerardo CALDERON-CASTILLO apprehended with LOPEZ-MORALES by the United States Border Patrol in April 2006.

### C. CS-2's Statement Regarding Her Being Smuggled From Guatemala To Oakland

15. During an interview conducted subsequent to her rescue, CS-2 described her journey from Guatemala into and through Mexico and how she was smuggled into the United States by walking across the U.S./ Mexico border. CS-2 knew her smuggler in Mexico as Petronilo. CS-2 advised that shortly after entering the United States, she was taken to a house in Phoenix, AZ where she was picked up by the driver, LOPEZ-MORALES,[6] of the smuggling vehicle (AZ 506WAE)[7] who drove her, CS-3, and two (2) other smuggled aliens[8] to California. CS-2 advised

---

[5] The AFIS and IDENT systems include electronic records of photographs and fingerprints of undocumented aliens apprehended by ICE, U.S. Customs and Border Protection (CBP), and the United States Border Patrol.

[6] During the initial interviews, and prior to the photographic identifications, neither CS-1, CS-2, nor CS-3 provided LOPEZ-MORALES' name. LOPEZ-MORALES name is used throughout this affidavit because it was later confirmed through records and the photographic lineup that the person CS-1, CS-2, and CS-3 were referring to as the driver of the smuggling vehicle was LOPEZ-MORALES.

[7] CS-2 advised that LOPEZ-MORALES was accompanied by a female who CS-2 believed to be LOPEZ-MORALES's wife.

[8] CS-2 indicated that one of these additional smuggled aliens had been smuggled into the United States with her. CS-2 advised that this smuggled alien had then been dropped off by LOPEZ MORALES in Los Angeles, CA on the way to Oakland, CA. CS-2 advised that in Los Angeles, LOPEZ-MORALES met with this smuggled alien's

4

that LOPEZ-MORALES knew that she was from Guatemala.

16. Upon arriving in Oakland, CS-2 heard LOPEZ-MORALES call CS-1 to get directions to where he could drop CS-2 off.[9] CS-2 heard LOPEZ-MORALES ask CS-1 where he wanted to pick CS-2 up and if he had the money ready. CS-2 advised that upon arriving at the Walgreen's parking lot, she saw CS-1, her father, her brother, and her brother's friend waiting. CS-2 advised that LOPEZ-MORALES rolled down his window and started talking to CS-1. CS-2 heard the driver tell CS-1 that he had brought his wife (CS-2) but had been told to collect more money from him. The amount CS-2 heard was something like $2500.00. CS-2 heard CS-1 tell LOPEZ-MORALES that he had already sent the money. CS-2 heard LOPEZ-MORALES tell CS-1 that if CS-1 did not have the money, LOPEZ-MORALES was not going to give CS-2 to CS-1. CS-2 advised that while LOPEZ-MORALES and CS-1 were arguing, CS-2 was able to roll down her window and hand CS-2's infant son to CS-2's brother who subsequently handed him to CS-2's father. CS-2 advised that she believed that LOPEZ-MORALES received a call from Petronilo, the smuggler in Mexico who had arranged for CS-2 to be smuggled into the United States. CS-2 advised that LOPEZ-MORALES handed his cell-phone to CS-2 and Petronilo told her that if CS-1 did not give them the money, CS-2 was going back to Guatemala. LOPEZ-MORALES also told CS-2 that they would not drop CS-2 off until they had the money. CS-2 advised that at this point, a friend of CS-1 began breaking the windows of the car. CS-2 advised that she tried to jump out of the car but it was already moving and CS-3 and the male smuggled alien pulled her back in. CS-2 saw CS-1 and her brother in front of the car when it had started moving. CS-2 heard LOPEZ-MORALES say that if CS-1 did not get out of LOPEZ-MORALES' way, LOPEZ-MORALES was going to run CS-1 over.

17. CS-2 advised that after she was driven away in the smuggling vehicle, she was crying because she was scared and separated from her baby. CS-2 advised that LOPEZ-MORALES told her that if she did not shut up, LOPEZ-MORALES would take her to the police who would send her back to Guatemala. CS-2 heard LOPEZ-MORALES tell the woman riding with them in the front seat of the car, who CS-2 believed was LOPEZ-MORALES's wife, that they were just going to go to a hotel in case they were looking for CS-2. CS-2 advised that during the drive to the hotel, LOPEZ-MORALES told her to be happy that he had not brought his guns, otherwise he would have killed them all (referring to CS-1 and CS-2's family at the Walgreen's.) CS-2 advised that at the hotel, she was still crying and LOPEZ-MOREALES told her that if she did not stop, he was going to call some of his friends to pick her up and not have any mercy on her.[10]

///

---

husband. CS-2 advised that she heard the smuggled alien's husband tell LOPEZ-MORALES that he had already deposited money. CS-2 heard LOPEZ-MORALES tell the smuggled alien's husband to give him $200.00 more. In terms of the other additional smuggled alien, CS-2 advised that he was enroute to Washington State and had left with the smugglers from the hotel in Fairfield, CA.

[9] Toll records for the driver's phone, 480-323-9470, on 2/2/2007 show several calls between the phone LOPEZ-MORALES had and a telephone number identified by CS-1 as CS-1's cell-phone. CS-1 advised that LOPEZ-MORALES did not tell CS-1 his name during their phone calls but that the name on the LOPEZ-MORALES' voicemail was "Lopez."

[10] The Spanish translation for not have any mercy was, " To not even touch her soul."

5

### D. CS-1's Statement Regarding Arranging For The Smuggling And Additional Payments Demanded By The Smugglers

18. CS-1 was also interviewed subsequent to the rescue of CS-2. CS-1 advised that in or about early January 2007 he had contacted a smuggler he knew as Petronilo to arrange to have CS-2 and their infant son smuggled into the United States.[11] CS-1 advised that he agreed upon a price of approximately $4000.00 U.S. with Petronilo to have CS-2 and their infant son smuggled into the United States. CS-1 indicated that he wired the entire smuggling fee to Mexico on two separate occasions prior to CS-2 arriving in Oakland, CA.[12]

19. CS-1 advised that in the Walgreen's parking lot, CS-1 spoke with LOPEZ-MORALES, told LOPEZ-MORALES that CS-1 had already paid for everything, and showed LOPEZ-MORALES the Western Union receipts. CS-1 advised that he spoke with Petronilo on a phone LOPEZ-MORALES handed to him. CS-1 advised that Petronilo told CS-1 that CS-1 should give them $2700.00 U.S. or they were going to take CS-2. Petronilo told CS-1 to give the money in cash right there or they were going to bring the girl (CS-2) back.

20. CS-1 advised that while CS-1 was arguing with LOPEZ-MORALES, CS-2 rolled down the rear window by where she was sitting in the vehicle. LOPEZ-MORALES started rolling the window back up, but CS-2's father held the window open and got CS-1 and CS-2's infant son out of the smuggling vehicle. CS-1 advised that, following this, LOPEZ-MORALES told CS-1 that CS-1 could keep the baby but CS-2 was not staying

21. After LOPEZ-MORALES drove away from the Walgreen's with CS-2, CS-1 advised that CS-1 received a call from Petronilo. CS-1 advised that Petronilo told him that if CS-1 did not pay, they were just going to bring CS-2 back and give her to Immigration. Petronilo told CS-1 that if CS-1 did not pay the money, CS-1 was going to pay when he returned to Guatemala because he (Petronilo) knew who CS-1 was. Petronilo told CS-1 that when CS-1 came back to Guatemala, even if it was five (5) to eight (8) years from now, CS-1 would have to pay him because he knew where CS-1's family was, and if CS-1 did not pay him, CS-1's family would have to. Petronilo told CS-1 that he would wait for CS-1 and that CS-1 would have to come back to Guatemala.

22. On February 2, 2007, while the search for CS-2 was being conducted, an incoming call to

---

[11] CS-1 has indicated that his arrangement with Petronilo was to have CS-2 and their son smuggled into the United States and brought to Oakland, CA.

[12] In the course of the investigation, money transfer receipts have been obtained from a Unigram Money Transfer in Oakland, CA where CS-1 indicated he sent the first installment of approximately $2000.00 to Petronilo around the time CS-2 and their son were at the Mexico/Guatemala border. The receipts show that CS-1 transferred $900.00 U.S. to a Petronilo Masarigo-Morales in Mexico on January 4, 2007, and another $900.00 U.S. to the same individual on January 5, 2007. On February 2, 2007, CS-1 provided OPD with Western Union transfer receipts for a total of $1900.00 U.S. that was sent on January 30, 2007. CS-1 has indicated that this was the second installment of the smuggling fee and that it was sent around the time of CS-2 and their son crossing the U.S./Mexico border. (A report from the OPD officer who interviewed CS-1 on February 2, 2007, states that CS-1 told him that he made the initial deposit of $2000.00 on January 30, 2007 when CS-2 was at the Guatemala/Mexico Border and the second deposit of $2000.00 on January 31, 2007 when CS-2 was in Mesa, AZ.)

6

CS-1's cell-phone was consensually monitored and recorded. CS-1 advised that the call had come from the smuggler in Mexico. A translation of the call from Spanish to English showed that an unknown Spanish-speaking male (UM) called CS-1 by CS-1's first name when CS-1 answered the phone. When CS-1 asked UM, "...are you the one that is taking my wife?" UM replied, "Yes sir." CS-1 told UM that he had, "...talked to Petronilo and he told me (CS-2's first name) was crying." UM replied, "She continues to cry..." A discussion then continued between CS-1 and UM regarding wiring money. At one point, UM told CS-1, "So then...This is not a game. All right! I, I uh...was talking to Petro, my compadre, and so we're doing this, I don't want to waste time and neither do you. Why don't you...don't you get that moving quickly." UM later told CS-1, "And the girl is going back, that's the problem," and " And the woman continues to be sad, she's sad. It's just that things aren't being done the way we agreed upon. I'm going to put Petro on so that you can talk to him." The phone was then handed to an individual believed to be Petronilo who continued to discuss the wiring of money with CS-1.

### E. CS-1, CS-2, and CS-3's Identification Of LOPEZ-MORALES In A Photographic Lineup

23. On June 15, 2007, CS-3 identified Julio LOPEZ-MORALES from a photographic line-up display as "Julio."[13] CS-3 explained to the ICE agent conducting the photo viewing that, beginning in Phoenix, Arizona, LOPEZ-MORALES was responsible for delivering CS-3 to her final destination in the United States.[14]

24. On June 18, 2007, CS-2 identified LOPEZ-MORALES from a photographic line-up display, stating that, "He is the driver of the car that brought me from Phoenix to Oakland. He took me to the hotel after the fight at the store."

25. On July 18, 2007, CS-1 identified LOPEZ-MORALES from a photographic line-up display, stating that, "He looks sort of like the one who took my wife but not exactly. He had short hair. The face does look like him."

26. The photograph of LOPEZ-MORALES used in each of these photographic line-ups was the photograph taken of LOPEZ-MORALES when he was arrested by the United States Border Patrol in April 2006.

### CONCLUSION AND REQUEST TO SEAL

27. Based on the foregoing, I submit that there is probable cause to believe that Julio LOPEZ-MORALES violated 8 U.S.C. §1324(a)(1)(A)(ii) – Bringing in and harboring certain aliens as a result of his transportation from Arizona to California of at least CS-2, who LOPEZ-MORALES knew was an alien who entered the United States in violation of law. I therefore

---

[13] CS-3 had previously viewed the same photographic line-up display containing the photo of LOPEZ-MORALES and not identified him. At the time of her positive identification of LOEPZ-MORALES, CS-3 advised that she had not previously identified him because she had been very scared and nervous, believing that she would be deported.

[14] CS-3 has advised that she was enroute to join family in Washington State.

7

request that the Court approve this complaint and issue an arrest warrant for Julio LOPEZ-MORALES.

28. Because this investigation is ongoing and the information in this complaint may put witnesses in danger and provide information to LOPEZ-MORALES, causing him to flee, I request that the Court direct the Clerk of the Court to maintain this affidavit and the criminal complaint under seal.

29. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed this ___20th___ day of July 2007, at San Francisco, California.

_____
Brian L. Ginn, Special Agent
Immigration and Customs Enforcement
U.S. Department of Homeland Security

Subscribed and sworn to before me this __20th__ day of __July__, 2007.

_____
The Hon. Nandor Vadas
United States Magistrate Judge
Northern District of California

8

AO 257 (Rev. 6/78)

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☒ COMPLAINT  ☐ INFORMATION  ☐ INDICTMENT  ☐ SUPERSEDING

Name of District Court, and/or Judge/Magistrate Location
**NORTHERN DISTRICT OF CALIFORNIA**

--- OFFENSE CHARGED ---

8 U.S.C. Section 1324(a)(1)(A)(ii) - Bringing in and harboring certain aliens

☐ Petty
☐ Minor
☐ Misdemeanor
☒ Felony

PENALTY:
10 years imprisonment, $250,000 fine, 3 years of supervised release, and $100 special assessment

--- DEFENDANT - U.S. ---

▶ JULIO LOPEZ-MORALES

DISTRICT COURT NUMBER

--- PROCEEDING ---

Name of Complaintant Agency, or Person (&Title, if any)
Immigration and Customs Enforcement Special Agent Brian Ginn

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrP 20, 21 or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
  ☐ U.S. Att'y  ☐ Defense

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

SHOW DOCKET NO.

MAGISTRATE CASE NO.

Name and Office of Person Furnishing Information on THIS FORM   **SCOTT N. SCHOOLS**
☒ U.S. Att'y  ☐ Other U.S. Agency

Name of Asst. U.S. Att'y (if assigned)   H. H. (Shashi) Kewalramani

--- DEFENDANT ---

**IS NOT IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior summons was served on above charges ▶
2) ☐ Is a Fugitive
3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**
4) ☐ On this charge
5) ☐ On another conviction
6) ☐ Awaiting trial on other charges   ☐ Fed'l  ☐ State
If answer to (6) is "Yes", show name of institution

Has detainer been filed?  ☐ Yes  ☐ No   If "Yes" give date filed _____
Month/Day/Year

DATE OF ARREST ▶ _____
Or... if Arresting Agency & Warrant were not Month/Day/Year

DATE TRANSFERRED TO U.S. CUSTODY ▶ _____

☐ This report amends AO 257 previously submitted

--- ADDITIONAL INFORMATION OR COMMENTS ---

PROCESS:
☐ SUMMONS  ☐ NO PROCESS*  ☒ WARRANT   Bail Amount: No Bail

If Summons, complete following:
☐ Arraignment  ☐ Initial Appearance
Defendant Address:

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time:
Before Judge:

Comments: